**Slip Op. 14-30**

### UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
DONGTAI PEAK HONEY INDUSTRY CO., :
LTD.,                            :
                                 :
          Plaintiff,             :  Before: Nicholas Tsoucalas,
                                 :          Senior Judge
     v.                          :
                                 :  Court No.: 12-00411
UNITED STATES,                   :
                                 :
          Defendant,             :
                                 :
          and                    :
                                 :
AMERICAN HONEY PRODUCERS         :
ASSOCIATION and SIOUX HONEY      :
ASSOCIATION,                     :
                                 :
          Defendant-Intervenors. :
_____ :
```

### OPINION

[Plaintiff's motion for judgment on the agency record is denied.]

Dated: March 21, 2014

Yingchao Xiao, Lee & Xiao, of San Marino, CA, for plaintiff.

Jane C. Dempsey, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With her on the brief were Stuart F. Delery, Assistant Attorney General, Jeanne E. Davidson, Director, Reginald T. Blades, Jr., Assistant Director. Of counsel on the brief was Sapna Sharma, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Michael J. Coursey, R. Alan Luberda, and Benjamin B. Caryl, Kelley Drye & Warren LLP, of Washington, DC, for defendant-intervenors.

**TSOUCALAS, Senior Judge:**  Plaintiff Dongtai Peak Honey Industry Co., Ltd. ("Peak"), moves for judgment on the agency record contesting the United States Department of Commerce's ("Commerce") determination in Administrative Review of Honey From

the People's Republic of China: Final Results of Antidumping Duty Administrative Review, 77 Fed. Reg. 70,417 (Nov. 26, 2012) ("Final Results").   Commerce and defendant-intervenors American Honey Producers Association and Sioux Honey Association oppose Peak's motion.   For the following reasons, Peak's motion is denied.

## BACKGROUND

Commerce initiated the tenth administrative review of honey from the People's Republic of China ("PRC") in January 2012. Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocation in Part, 77 Fed. Reg. 4759 (Jan. 31, 2012).   Commerce named Peak a respondent.   Id. at 4761.

On March 2, 2012, Commerce issued a nonmarket economy ("NME") questionnaire to Peak.   See NME Questionnaire (Mar. 2, 2012), Public Rec. 11[1] at 1.   Peak timely filed its response to section A of the questionnaire, and filed its response to sections C and D of the questionnaire after receiving a one-day extension of the deadline from Commerce.   See Peak's § A Questionnaire Resp. (Mar. 23, 2012), CR 4-6; Peak's §§ C and D Questionnaire Resp. (Apr. 10, 2012), PR 24.

On April 3, 2012, Commerce issued a supplemental section A questionnaire "addressing certain deficiencies" in Peak's section

---

[1] Hereinafter, all public record documents will be designated "PR" and all confidential record documents will be designated "CR" without further specification except where relevant.

A questionnaire response.  Supplemental § A Questionnaire (Apr. 3, 2012), PR 22 at 1.  The deadline for Peak's supplemental section A questionnaire response ("SSAQR") was April 17, 2012.  Id. at 1.

Peak did not submit its SSAQR by April 17, 2012.  Rather, on April 19, 2012, Peak filed a request to extend the deadline to April 27, 2012 ("April 19th Letter").  See Rejection of Supplemental § A Questionnaire Resp. and Removal from the Record (May 22, 2012), PR 40 at 1.  Peak requested an extension of time because of an overlap with the deadline to file its sections C and D questionnaire response, a national holiday, issues with its translator, issues communicating with its U.S.-based attorneys, and a computer failure.  See Br. Supp. Pl.'s R. 56.2 Mot. J. Agency R. at 12 ("Pl.'s Br.").

On April 27, 2012, Peak submitted a request for an additional one-day extension of the deadline.  PR 40 at 1. Following the close of business on April 27, 2012, Peak submitted its SSAQR to Commerce.  Id.

Commerce denied Peak's extension request because "good cause [did] not exist . . . to extend retroactively its deadline for the extension request."  Id. at 2.  Specifically, Commerce noted that, although Peak explained why it could not timely file its SSAQR, "Peak provided no explanation as to why it was unable to file its extension request in a timely manner prior to the deadline for its questionnaire response."  Id.  Commerce removed from the

record both of Peak's extension requests and the SSAQR.  Id.

Although Peak requested reconsideration of this decision, Commerce continued to find it appropriate to deny Peak's extension requests and remove them and the SSAQR from the record in its preliminary determination. Honey From the PRC: Preliminary Results of Review, 77 Fed. Reg. 46,699, 46,701-02 (Aug. 6, 2012) ("Preliminary Results"). Commerce again noted that the April 19th Letter did not address Peak's inability to file an extension request by the deadline. Id. It also stated that the deadline was significant in the instant case because it found Peak's U.S. sales non-bona fide in prior reviews and therefore needed time for a full analysis of the information it sought in the supplemental section A questionnaire. Id. at 46,701.

Additionally, Commerce preliminarily determined that, without a complete section A questionnaire response, the record lacked sufficient information to calculate a separate rate for Peak. Id. at 46,702. As a result, Commerce found Peak "to be part of the PRC-wide entity." Id.

Commerce also preliminarily determined that the PRC-wide entity, including Peak, did not cooperate to the best of its ability during the review. Id. Therefore, Commerce relied entirely on adverse facts available ("AFA") to determine the dumping margin for the PRC-wide entity. Id. Commerce selected a rate of $2.63/kg, which it calculated for Anhui Native Produce

Import & Export Corporation ("ANP") during the sixth administrative review of honey from the PRC.  Id. at 46,703.

 In its final determination, Commerce upheld the results of the Preliminary Review in their entirety.  See Final Results, 77 Fed. Reg. at 70,418.  See also Administrative Review of Honey from the PRC: Issues and Decision Memorandum for the Final Results (Nov. 19, 2012), PR 56 at 1 ("I&D Memo").

 Peak contests several aspects of the Final Results, including: (I) the denial of Peak's extension requests and the removal of those requests and the SSAQR from the record; (II) the decision to impose the PRC-wide rate; (III) the reliance on AFA to calculate the dumping margin; and (IV) the use of the $2.63/kg figure for the AFA rate.  See Pl.'s Br. at 1–3.

## JURISDICTION and STANDARD OF REVIEW

 This Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2006) and Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930,[2] as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2006).

 This Court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence "means such relevant evidence as a reasonable

---

[2] All further references to the Tariff Act of 1930 will be to the relevant provisions of Title 19 of the United States Code, 2006 edition, and all applicable supplements thereto.

mind might accept as adequate to support a conclusion." Universal
Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951).

        Additionally, "[c]ourts look for a reasoned analysis or
explanation for an agency's decision as a way to determine whether
a particular decision is arbitrary, capricious, or an abuse of
discretion." Wheatland Tube Co. v. United States, 161 F.3d 1365,
1369 (Fed. Cir. 1998). "An abuse of discretion occurs where the
decision is based on an erroneous interpretation of the law, on
factual findings that are not supported by substantial evidence, or
represent an unreasonable judgment in weighing relevant factors."
WelCom Prods., Inc. v. United States, 36 CIT __, __, 865 F. Supp.
2d 1340, 1344 (2012) (citing Star Fruits S.N.C. v. United States,
393 F.3d 1277, 1281 (Fed. Cir. 2005)). "[A]n agency action is
arbitrary when the agency offers insufficient reasons for treating
similar situations differently." SKF USA Inc. v. United States,
263 F.3d 1369, 1382 (Fed. Cir. 2001).

## DISCUSSION

### I. The Untimely Submissions

        The first issue before the court is whether Commerce
erred in denying Peak's extension requests and removing the
requests and the SSAQR from the record. "Commerce has broad
discretion to establish its own rules governing administrative
procedures, including the establishment and enforcement of time
limits." Yantai Timken Co. v. United States, 31 CIT 1741, 1755,

521 F. Supp. 2d 1356, 1370 (2007).   Furthermore, the Court of
Appeals for the Federal Circuit ("Federal Circuit") recently held
that "[t]he role of judicial review is limited to determining
whether the record is adequate to support the administrative
action[,]" and therefore "[a] court cannot set aside application of
a proper administrative procedure because it believes that properly
excluded evidence would yield a more accurate result."  PSC VSMPO-
Avisma Corp. v. United States, 688 F.3d 751, 761 (Fed. Cir. 2012).

        Commerce's regulations state that Commerce "may, for good
cause, extend any time limit."  19 C.F.R. § 351.302(b).[3]  A party
may request an extension "[b]efore the applicable time limit . . .
expires."  Id. at § 351.302(c).  "The request must be in writing,
. . . and state the reasons for the request."  Id.  If Commerce
refuses to extend the time limit, it generally "will not consider
or retain in the official record of the proceeding . . . [u]ntimely
filed factual information, written argument, or other material."
Id. at § 351.302(d).

        According to Peak, Commerce should have extended the
deadline upon Peak's showing of good cause in the April 19th Letter.
See Pl.'s Br. at 12.  Peak argues that the April 19th Letter

---

[3] The references to and quoted language from 19 C.F.R. §
351.302 reflect the language of the regulation during the
underlying review unless otherwise specified by the court.  In
September 2013, Commerce amended section 351.302 effective for all
segments initiated after October 21, 2013.  See Extension of Time
Limits: Final Rule, 78 Fed. Reg. 57,790 (Sept. 20, 2013).

explained both why it could not prepare its SSAQR before the deadline and why it could not file an extension request before the deadline.   Id.   Relying on prior proceedings in which Commerce granted untimely extension requests, Peak argues that Commerce's refusal to extend the deadline was arbitrary and an abuse of discretion because Commerce departed from a "long practice" of accepting and granting untimely extension requests supported by good cause.   Id. at 9–12.

Contrary to Peak's insistence, Commerce reasonably determined that Peak's extension requests were unsupported by good cause.   Commerce found that Peak failed to comply with the regulations by filing its extension requests after the deadline expired.   PR 40 at 2.   Although it noted that it accepted untimely extension requests when supported by good cause in prior reviews, Commerce found that the facts of the instant case did not warrant granting Peak's untimely requests.   I&D Memo at 5-6.   Commerce noted that Peak was aware of the deadline in question and its particular importance given the need to determine whether Peak's U.S. sales were bona fide and whether Peak was eligible for a separate rate in the preliminary results.   Id. at 5.   With regards to the April 19th Letter, Commerce stated that Peak's explanation did not adequately demonstrate why it was unable to file the extension request before the deadline expired because all of the causes of delay were known to Peak before the April 17th deadline

and could not have prevented Peak from filing an extension request before that date. Id. at 6. Essentially, Commerce found that Peak was entirely capable of submitting its extension request on time, but simply failed to do so. Id. Because Peak failed to file its extension requests before the deadline to file the SSAQR expired even though it was capable of doing so, Commerce reasonably determined that there was not good cause to retroactively extend the deadline. See 19 C.F.R. § 351.302(b); (c).[4] And, because it denied the extension requests, Commerce reasonably determined that Peak's SSAQR was untimely and removed it from the record. Id. at § 351.302(d).

Peak also argues that Commerce's refusal "even to look at [Peak's] good cause presentation [was] a deprivation of a statutory right." Pl.'s Br. at 16. However, this argument is both factually incorrect and inconsistent with law. As noted above, Commerce considered Peak's good cause presentation and found that it was insufficient to warrant retroactively extending the deadline. See I&D Memo at 5-6. Furthermore, Commerce's decision to deny the extension request did not violate Peak's "statutory rights." In

---

[4] Although they do not apply to the instant case, the amendments to section 351.302 impose a new standard for analyzing untimely filed extension requests. See Extension of Time Limits; Final Rule, 78 Fed. Reg. at 57,795. The amended regulation reads: "An untimely filed extension request will not be considered unless the party demonstrates that an extraordinary circumstance exists." 19 C.F.R. § 351.302(c) (2013).

PSC VSMPO, the Federal Circuit found that Commerce's rejection of untimely filed factual information did not violate a respondent's due process rights where the respondent had notice of the deadline and an opportunity to comply.  PSC VSMPO, 688 F.3d at 761-62.  Here, Commerce notified Peak of the deadline to file its SSAQR.  PR 22 at 1.  As Commerce found, Peak had an opportunity to comply with the deadline but failed to do so.  I&D Memo at 6.  Although this case involves untimely extension requests in addition to an untimely submission of factual information, the Federal Circuit's rationale in PSC VSMPO holds: Commerce did not violate Peak's rights because Peak had notice of the deadline and an opportunity to comply, but simply failed to timely file its requests to extend the deadline.  See PSC VSMPO, 688 F.3d at 761-62.

        Finally, Peak claims that Commerce's decision to deny Peak's extension requests was an abuse of discretion because it prevented Commerce from calculating the margin as accurately as possible.  Pl.'s Br. at 15-16.  Relying on this Court's holding in Grobest & I-Mei Industrial (Vietnam) Co. v. United States, 36 CIT __, 815 F. Supp. 2d 1342 (2012), Peak argues that Commerce should have extended the deadline because the burden of accepting the SSAQR was "minuscule" and the denial of Peak's request resulted in the application of a margin based on AFA.  Id.

        This argument is flawed.  Although Peak's SSAQR would have contained information relevant to the dumping margin

determination, Commerce was not required to place it on the record See PSC VSMPO, 688 F.3d at 761 ("A court cannot set aside application of a proper administrative procedure because it believes that properly excluded evidence would yield a more accurate result."). As discussed above, Commerce properly determined that Peak's extension requests were untimely submitted and failed to demonstrate good cause to extend the deadline, and therefore removed Peak's requests and SSAQR from the record. See 19 C.F.R. § 351.302(b)-(d). Accordingly, the court declines to reverse Commerce's decision. See PSC VSMPO, 688 F.3d at 761.

Furthermore, Peak's reliance on Grobest is misplaced. In Grobest, Commerce rejected the separate rate certification that Amanda Foods filed, without an extension request, ninety-five days after the deadline and seven months before the preliminary determination. Grobest, 36 CIT at __, 815 F. Supp. 2d at 1365. The Court stated that, when assessing Commerce's decision to reject an untimely submission, it "will review on a case-by-case basis whether the interests of accuracy and fairness outweigh the burden placed on [Commerce] and the interest in finality." Id., 815 F. Supp. 2d at 1365. The Court held that Commerce abused its discretion by rejecting the certificate because: (1) Amanda Foods demonstrated its separate rate eligibility in all prior segments of the proceeding and therefore "it appear[ed] likely that, but for the untimeliness of its submission, Amanda Foods would have

received a separate rate"; and (2) given the minimal analysis of the separate rate certifications Commerce undertook in previous reviews, "every indication suggest[ed] that the burden of reviewing the [separate rate certification] would not be great." Id. at __, 815 F. Supp. 2d at 1366–67.

        Peak insists that the burden of accepting the SSAQR would have been smaller than the burden in Grobest, as the SSAQR was "relatively small and minor" and "filed only a few days late." Pl.'s Br. at 15.  While the Court cannot determine exactly the burden on Commerce had it extended the deadline, the record indicates that the burden would not have been "minuscule," as Peak suggests.  Peak filed its SSAQR less than four months before the deadline for Commerce to issue its preliminary determination. I&D Memo at 13.  The SSAQR would have provided narrative and documentary evidence in response to nine pages of questions concerning Peak's management, shareholders, accounting practices, affiliations, U.S. sales, domestic sales, and merchandise. See PR 22 at 4–12.  As Commerce explained, this information would have been relevant to Commerce's bona fide sales and separate rate analyses. I&D Memo at 13.  And, given that Commerce found Peak's U.S. sales to be non-bona fide in two prior reviews, id., the evidence suggests that the analysis of the information that Peak would have provided in the SSAQR would have been more extensive than an analysis of the separate rate certification in Grobest.

See Grobest, 36 CIT at __, 815 F. Supp. 2d at 1367.

        Ultimately, Commerce's decision to deny Peak's extension request was consistent with the regulations and therefore within its recognized discretion to set and enforce time limits.  See Yantai Timken, 31 CIT at 1755, 521 F. Supp. 2d at 1370.  Although Commerce exercised this discretion strictly, it neither acted arbitrarily nor abused its discretion because it provided a reasoned explanation of its decision consistent with the regulatory framework and the record.  See Wheatland Tube, 161 F.3d at 1369. Furthermore, because Commerce properly denied Peak's untimely request for an extension, it properly removed the extension requests and the untimely SSAQR from the record of the review.  See 19 C.F.R. § 351.302(d).

### III. Separate Rate Eligibility

        Also at issue is Commerce's decision to treat Peak as part of the PRC-wide entity.  In antidumping duty proceedings involving merchandise from a NME, as is the case here, Commerce presumes that all respondents are government controlled and therefore subject to the country-wide rate.  See Sigma Corp. v. United States, 117 F.3d 1401, 1405 (Fed. Cir. 1997).  Commerce does allow respondents to rebut this presumption, however, by establishing the absence of both de jure and de facto government control.  Id.  Respondents who make this showing are eligible for a separate rate.  Id.

Peak alleges that Commerce erroneously treated Peak as part of the PRC-wide entity.  See Pl.'s Br. at 22-25.  Relying again on Grobest, Peak insists that any information missing from the record relevant to its separate rate eligibility was the result of Commerce's wrongful decision to reject and remove from the record the SSAQR.  Id. at 23-24.  Peak also denies that the record was insufficient to establish Peak's separate rate eligibility, as its initial section A questionnaire response demonstrated the absence of government control and the supplemental section A questionnaire did not solicit relevant information.  Id. at 24-25.

Peak's reliance on Grobest is misplaced because, as noted above, Commerce's decision to remove the SSAQR was consistent with the regulations and within its discretion.  See 19 C.F.R. § 351.302(d); Yantai Timken, 31 CIT at 1755, 521 F. Supp. 2d at 1370. The record lacked certain information regarding Peak's separate rate eligibility because Peak failed to timely file its extension requests and failed to show good cause to extend the deadline.  See 19 C.F.R. § 351.302(b); (c).

Furthermore, Peak's insistence that its initial section A response was sufficient to demonstrate its separate rate eligibility is unavailing.  Although Peak does not actually identify any of the evidence in its section A questionnaire response demonstrating the lack of government control in its brief, see Pl.'s Br. at 24, an inspection of Peak's initial section A

response does indicate that Peak provided translations of Chinese law and information concerning its ownership and corporate structure. See CR 4-6. However, the fact that Peak provided some evidence of its eligibility for a separate rate is insufficient to render Commerce's decision unsupported by substantial evidence. See Sigma Corp., 117 F.3d at 1405. Ultimately, it was Peak's burden to demonstrate the absence of de jure and de facto government control. See id. The supplemental section A questionnaire contained a "Separate Rates" section soliciting information concerning Peak's shareholders, management, and affiliation with other entities within the Chinese honey industry. See PR 22 at 4-6. Because Peak failed to file either its SSAQR with this information or an extension request before the deadline, Commerce reasonably concluded that Peak failed to demonstrate the absence of government control. See Sigma Corp., 117 F.3d at 1405. Accordingly, Commerce's reasonably treated Peak as part of the PRC-wide entity. Id.

### III. Adverse Facts Available

The next issue is whether Commerce properly relied on AFA to determine the dumping margin for the PRC-wide entity. If Commerce "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information," it "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise

available."  19 U.S.C. § 1677e(b).

        Peak argues that Commerce erred in its use of AFA to determine the dumping margin for the PRC-wide entity.  See Pl.'s Br. at 25-29.  Relying on this Court's holding in Nippon Steel Corp. v. United States, 24 CIT 1158, 118 F. Supp. 2d 1366 (2000) ("Nippon I"), Peak contends that Commerce's determination was contrary to law because "an untimely submission of a questionnaire response . . . does not equal a failure to cooperate to the best of [one's] ability, and does not warrant an adverse inference."  Pl.'s Br. at 26 (citing Nippon I, 24 CIT at 1169, 118 F. Supp. 2d at 1377). Because Commerce simply equated Peak's untimely submission with Peak's failure to cooperate to the best of its ability, Peak insists that Commerce failed to verify the accuracy of the the information contained in the SSAQR and failed to consider the circumstances surrounding the untimely submission.  Id. at 27-29. Peak suggests that the record actually evidences its full cooperation with the review, as it timely filed its initial questionnaire responses and filed its SSAQR as quickly as possible. Id. at 27-28.

        Commerce's determination was consistent with the law. "[T]he statutory mandate that a respondent act to 'the best of its ability' requires the respondent to do the maximum it is able to do."  Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003) ("Nippon II").  The Federal Circuit further

explained that:

> Before making an adverse inference, Commerce must examine respondent's actions and assess the extent of respondent's abilities, efforts, and cooperation in responding to Commerce's requests for information. Compliance with the "best of its ability" standard is determined by assessing whether respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries[.] . . . While the standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping.

Id.

Here, Commerce found that "Peak was aware of its responsibilities to meet the established deadline, but nonetheless failed to submit its documents in a timely manner." I&D Memo at 15. As noted throughout this opinion, Commerce found that the computer failure, communication problems, translation problems, overlapping deadlines, and national holiday that Peak relied on in the April 19th Letter did not prevent Peak from timely filing an extension request. Id. at 15-16. Thus, Commerce determined that Peak "placed itself in a position in which it could not comply with the deadline." Id. at 16. Because a "reasonable respondent" would have complied with the deadline in these circumstances, Commerce concluded that Peak evidenced a "reckless disregard for compliance standards," and therefore failed to cooperate with the review to the best of its ability. Id.

The court finds that Commerce's determination was

reasonable and consistent with the law.  Contrary to Peak's argument, Commerce did not simply equate Peak's untimely submission with a failure to cooperate.  In fact, the record indicates that Commerce considered the circumstances of Peak's untimely submission.  See id. at 15–16.  It noted that it set the deadline with regard for the time necessary to analyze and verify the information contained in the SSAQR, and found that Peak was aware of the deadline and had the opportunity to request an extension before the deadline expired.  Id.  Given Peak's failure to comply, it is immaterial that Peak timely submitted other sections of the questionnaire.  Because Peak was aware of the deadline and had the opportunity to file an extension request prior to its expiration, Peak's failure to do so indicated an inattentiveness or carelessness with regards to its obligations that warranted the use of AFA.  See Nippon II, 337 F.3d at 1382.  Therefore, Commerce's decision to rely on AFA is supported by substantial evidence and in accordance with law.  Id.

### IV. The Adverse Facts Available Rate

The final issue before the court is whether Commerce properly selected the $2.63/kg AFA rate for the PRC-wide entity. When relying on AFA, Commerce may use information from the petition, investigation, prior administrative reviews, or "any other information placed on the record."  19 U.S.C. § 1677e(b). When it "relies on secondary information rather than on information

obtained in the course of an investigation or review," Commerce "shall, to the extent practicable, corroborate that information from independent sources that are reasonably at [its] disposal." Id. at § 1677e(c).  To corroborate secondary information, Commerce must find that it has "probative value."  See KYD, Inc. v. United States, 607 F.3d 760, 765 (Fed. Cir. 2010).  Secondary information has "probative value" if it is reliable and relevant.  Mittal Steel Galati S.A. v. United States, 31 CIT 730, 734, 491 F. Supp. 2d 1273, 1278 (2007); see KYD, 607 F.3d at 765-67.

Peak argues that the $2.63/kg figure Commerce used  rate was neither reliable nor relevant.  Pl.'s Br. at 29-30.  According to Peak, Commerce should not have relied on a rate from the 2006-2007 administrative review because of "fluctuations in sales prices, production and transportation costs, market conditions, and so forth known to [Commerce] since that review period." Id. at 29. Peak also insists that there was no evidence in the record indicating that this rate was reliable.  Id. at 30.

Peak's argument is unpersuasive.  In both its case brief before Commerce and in its brief before this Court, Peak insists that Commerce knows of market fluctuations and other changes in the Chinese honey industry since the 2006-2007 review.  See Peak's Administrative Case Brief (Sept. 5, 2012), PR 52 at 23; Pl.'s Br. at 29-30.  However, Peak provided no evidence of such changes before Commerce, see PR 52 at 23, and does not do so here.  See

Pl.'s Br. at 29-30. Peak's bare assertion that such changes occurred is insufficient to undermine Commerce's selection of ANP's rate to determine the margin for the PRC-wide entity. See Qingdao Maycarrier Imp. & Exp. Co. v. United States, 37 CIT __, __, 949 F. Supp. 2d 1335, 1343 (2013) (Tsoucalas, J.) (citing Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966)) (Plaintiff's alternative interpretation of the record, unsupported by any record evidence, was insufficient grounds to overturn Commerce's determination.).

        Furthermore, Peak's insistence that the rate was unsupported by substantial evidence in the record is also incorrect.  This Court has noted that, "[u]nlike other sources of information, there are no independently verifiable sources for calculated dumping margins, other than previous administrative determinations." Peer Bearing Co.-Changshan v. United States, 32 CIT 1307, 1314, 587 F. Supp. 2d 1319, 1328 (2008).  Therefore, when calculating the AFA rate for the PRC-wide entity, "the reliability of the calculation stems from its basis in prior verified information in previous administrative reviews," and "[i]f Commerce chooses a calculated dumping margin from a prior segment of the proceeding, it is not necessary to question the reliability of the margin if it was calculated from verified sales and cost data." Id., 587 F. Supp. 2d at 1328.  Here, Commerce calculated the AFA rate using verified sales and cost data for ANP from an

administrative review of honey from the PRC covering sales between 2006 and 2007.  I&D Memo at 18-19.  It noted that ANP's data "reflect[ed] the commercial reality of another respondent in the same industry" as Peak.  Id. at 18.  As discussed, Peak failed to provide any evidence indicating that this rate was not reliable. See PR 52 at 23; Pl.'s Br. at 29-30.  Because Commerce based the AFA rate on ANP's verified sales and cost data and Peak has not identified any evidence indicating that the rate lacked probative value, Commerce's determination was reasonable.  See Peer Bearing, 32 CIT at 1314, 587 F. Supp. 2d at 1328.

        Finally, Peak suggests that the rate Commerce selected was not relevant because it was "not based on [Peak]'s own sales an production data for the current period of review."  Pl.'s Br. at 30.  Accordingly, Peak argues that Commerce's selection of ANP's rate was a violation of Commerce's duty to "apply the most accurate rates possible to individual respondents."  Id.

        This argument must fail as well.  Because Peak was part of the PRC-wide entity, Commerce was not required to calculate a separate AFA rate relevant to Peak.  See Peer Bearing, 32 CIT at 1313, 587 F. Supp. 2d at 1327 ("[T]here is no requirement that the PRC-wide entity rate based on AFA relate specifically to the individual company.").  Therefore, it was not necessary for Commerce to corroborate the AFA rate for the PRC-wide entity using the sales data Peak provided during the review.  Id. Accordingly,

Peak fails to show that Commerce erroneously relied on ANP's rate to calculate the AFA margin for the PRC-wide entity.

### CONCLUSION

Commerce's decision to deny Peak's untimely extension requests and remove the extension requests and Peak's supplemental section A questionnaire response from the record was a proper exercise of its discretion.  Additionally, Commerce's decision to treat Peak as part of the PRC-wide entity and its decision to impose a dumping margin of $2.63/kg based on adverse facts available were supported by substantial evidence and in accordance with law.  Peak's motion for judgment on the agency record is denied.  Judgment will be entered accordingly.


                                          /s/ Nicholas Tsoucalas
                                        **Nicholas Tsoucalas**
                                           **Senior Judge**


**Dated:** March 21, 2014
        **New York, New York**